IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| Plaintiff, | * | |
| | * | Crim. No. 17-20336-SHL-dkv |
| NASSEAM ELKARRA *et al,* | * | |
| Defendants. | * | |

---

**RESPONSE OF THE UNITED STATES
TO DEFENDANT'S MOTION TO SUPPRESS**

---

COMES NOW the United States of America, by and through D. Michael Dunavant, United States Attorney, and Christopher E. Cotten, Assistant United States Attorney for the Western District of Tennessee, and responds as follows to defendant Nasseam Elkarra's Motion to Suppress (RE-89):

## STATEMENT OF FACTS

On or about January 6, 2017, agents of the Drug Enforcement Administration (DEA) requested assistance from agents of U.S Homeland Security Investigations (HSI) in the investigation of defendant Nasseam Elkarra ("defendant" or "Elkarra"). DEA informed HSI that Elkarra would be traveling through San Francisco International Airport on January 6, 2017; that that Elkarra was linked to a marijuana trafficking organization that had been shipping marijuana from the San Francisco area to Memphis, Tennessee; and that Elkarra was believed to be a financier of the organization.

On January 6, 2017, Elkarra arrived at San Francisco International Airport on a flight originating in Mexico City, Mexico. Prior to clearing Customs for entry into the United States, Elkarra was stopped by agents of U.S. Customs and Border Protection (CBP) and taken from primary to secondary screening to be interviewed. While in the secondary screening area, which was adjacent to the primary screening area, Elkarra was asked by CBP agents to surrender his mobile phone and its protective password; and Elkarra complied. Agents informed Elkarra that his phone would be detained, imaged, and examined pursuant to a border search. Agents told Elkarra that he was free to leave at any time and have his phone mailed to him, or he could wait for his phone at the airport. Elkarra opted to wait.

CBP agents then transported the phone, an Apple iPhone 7, to another adjacent room where it was imaged – that is, an electronic copy was made of its contents – by an HSI agent. Following this imaging, the phone was returned to Elkarra.

The image of Elkarra's phone was then brought to the HSI Computer Forensics Lab in San Francisco, where it was searched by HSI agents using the Cellbrite program. Cellbrite is software used to capture data which has not been deleted and would be visible to any manual user, including contact lists, pictures, and text messages. It then downloads the data and prints out a report.

The Cellbrite search of Elkarra's phone was completed on January 17, 2017. The results were viewed by HSI agents between January 18 and 19, 2017.

Their examination of the contents of Elkarra's phone revealed, among other things, a large amount of text message communications between and among Elkarra, co-defendants Jijad Hijazi and Christopher Heffernan, and another unindicted individual using the instant messaging platform "WhatsApp."

Because HSI only shares information gleaned during border searches with other agencies if there is a joint investigation, DEA Special Agent Austin Curnow then applied for a search warrant for the information already gathered during the border search, so that it could be turned over to DEA for use in the instant case. The warrant application used information gleaned from the border search of Elkarra's phone as part of its probable cause statement. The warrant was signed U.S. Magistrate Judge Laurel Beeler on February 3, 2017.

**<u>ARGUMENT</u>**

I.    **THE SEARCH OF THE DEFENDANT'S PHONE WAS
A VALID BORDER SEARCH**.

Elkarra first argues that the search of his phone cannot not justified as a warrantless, suspicionless border search. Rather, according to the defendant, the search required reasonable suspicion, which he contends was lacking. However, because the search of Elkarra's phone was within the scope of a permissible border search, no additional legal justification was required; and even if the defendant is correct that the search of his phone contents required reasonable suspicion, agents had it.

"The Supreme Court has recognized a broad exception to the Fourth Amendment's requirement of probable cause or a warrant for searches conducted at the border because '[t]he Government's interest in preventing the entry of unwanted persons and effects is at is zenith at the international border.'" *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013) (quoting *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004)). "Under that exception, searches of people and their property at the borders are *per se* reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion." *Stewart* at 524 (citing *Flores-Montano* at 512-153; *United States v. Montoya de Hernandez*, 473 U.S. 531, 537-40 (1985); and *United States v. Ramsey*, 431 U.S. 606, 616-18 (1977)). The Supreme Court has recognized only three situations in which border searches may not be reasonable *per se*, and thus must be supported by reasonable suspicion: "highly intrusive searches of the person"; destructive searches of property; and searches conducted in a "particularly offensive" manner. *Flores-Montano* at 152-56. An international airport is the functional equivalent of a border for flights arriving from other countries. *Stewart* at 526; *United States v. Lawson*, 461 F.3d 697, 700 (6th Cir. 2006).

In *Stewart*, the defendant arrived at the Detroit Airport on an international flight from Japan with two laptop computers in his possession: a Sony and a Twinhead. *Stewart* at 520. A customs agent conducted a border search of the contents of the Sony and found about a dozen images which he believed to be child pornography. *Id.* at 521. Agents then informed Stewart that they were detaining both laptaps, but that he was free to leave, which he did. *Id.* (It was not possible to search the Twinhead on-site because it required an international power cord). *Id.*

Agents then transported the two computers to the local Immigration and Customs Enforcement Office where agents viewed images stored on the Twinhead by manually scrolling through them. *Id.* The search revealed additional images of child pornography. *Id.*

The Sixth Circuit upheld the searches of both computers under the government's border search authority, noting that, "[a]lthough [Stewart] was cleared to leave after the initial search, his computers were not": and that, "[i]n the course of conducting a customs examination, property remains in the custody of CBP and may be tested off-site by private testing or by CBP until 'cleared' for entry". *Id.* at 525 (citing 19 U.S.C. § 1499(a)(1), (a)(2)(B), (b)(1-3), and (c)(1)).

The border search in this case was conducted under conditions even less intrusive than those upheld in *Stewart*. Rather than detaining Elkarra's phone for an extended period and transporting it to an off-site location to be searched, CBP and HSI maintained possession only long enough to image its contents before returning it to him while he was still at the airport. Meanwhile, like Stewart, Elkarra was advised that he himself was free to leave at any time. Thus, the search of Elkarra's phone was within the scope permitted under Sixth Circuit law for a routine border search of electronic devices, and that search was therefore *per se* reasonable without any additional justification.

The defendant nonetheless argues for the application of *United States v. Cotterman*, 709 F.3d 952, 963 (9th Cir. 2013) (*en banc*), in which the Ninth Circuit held that the Fourth Amendment requires that a border search consisting of the forensic examination of an electronic device must be justified by reasonable suspicion. However, *Cotterman*, should not result in the suppression of evidence in this case because: 1) the case is an outlier in that no other circuit has required reasonable suspicion for this type of border search, and the Supreme Court has never required it for the border search of property; 2) notwithstanding, the Court need not decide whether *Cotterman* should apply in this circuit because the search in this case does not rise to the level of the "forensic examination" described in *Cotterman* as requiring heightened justification; and, 3) even if this Court does apply *Cotternman* and require reasonable suspicion for the search of Elkarra's phone, the agents in this case had it.

First, the *Cotterman* decision is an outlier, falling outside of established border search jurisprudence. As Judge Callahan notes in her partial concurring opinion in *Cotterman*:

> In the long time that the [Supreme] Court has recognized the border search doctrine, the Court has found just *one* search at the border that required reasonable suspicion. *See, Montoya de Hernandez*, 471 U.S. at 541, 105 S.Ct. 3304 (upholding 24-hour detention of a woman suspected of smuggling illegal drugs in her digestive system, followed by a pregnancy test and rectal examination, based on reasonable suspicion). In the remaining cases, the Court consistently has described the government's border search authority in very broad terms and overturned the lower courts' attempts to cabin that authority.

*Cotterman* at 971-72 (Callahan, J., concurring in part, dissenting in part, and concurring in the judgment).

Moreover, as Judge Smith points out in his vigorous dissent in *Cotterman*, in requiring a heightened degree of justification for the border search of electronic devices, "the Ninth Circuit stands alone, as it so often does." *Cotterman* at 983 (Smith, J., dissenting). In fact, the Fourth Circuit rejected such a requirement in *United States v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005) ("However, to state the probability that reasonable suspicions will give rise to more intrusive searches is a far cry from enthroning this notion as a matter of constitutional law. The essence of border search doctrine is a reliance upon the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search"). The Third Circuit did likewise in *United States v. Linarez-Delgado*, 259 Fed. Appx. 506, 508 (3rd Cir. 2007) ("Data storage media and electronic equipment such as films, computer devices, and videotapes, may be inspected and viewed during a reasonable border search."). *See also, United States v. Thompson*, 53 F.Supp.3d 919, 923 (W.D. La. 2014) (defendant's electronic devices, including computer, mobile phone, and external hard drive, could be searched under border search authority without reasonable suspicion); *Abidor v. Napolitano*, 990 F.Supp.2d 260, 282 (E.D.N.Y. 2013) (denying declaratory relief enjoining government from conducting suspicionless border searches of electronic devices and finding that, "locking in a particular standard for searches would have a dangerous, chilling effect as officer's often split-second assessments are second guessed") (citations omitted); *United States v. McAuley*, 563 F.Supp.2d 672, 677-78 (W.D. Tex. 2008) (government could search defendant's computer and external hard drives during routine border search without reasonable suspicion, even though computer contained personal information and was password protected).

7

In addition, notwithstanding the fact that *Cotterman* represents a departure from the majority rule, this Court need not decide whether to apply it in this circuit because the search in this case does not rise to the level of the "forensic examination" which *Cotterman* describes as requiring heightened justification.

In the search described by the Ninth Circuit in *Cotterman* described as a "forensic examination," the investigating agent "used a software program called EnCase that exhibited the distinctive features of computer forensic examination. The program copied, analyzed, and preserved the data stored on the hard drive and gave the examiner access to far more data, including password-protected, hidden or encrypted, and deleted files, than a manual user could access." *Cotterman* at 963 n.9.

By contrast, the agents in this case, simply made a copy of the data stored on Elkarra's phone and extracted certain information from that copy using Cellbrite. Despite Agent Curnow's inexpert characterization of those actions in the warrant affidavit as "forensic downloads,"[1] they do not rise to the level of intrusiveness inherent in the Ninth Circuit's definition of "forensic examination" in *Cotterman.*

In fact, in *United States v. Lopez*, 2016 WL 7370030, *3 (S.D. Cal. Dec. 20, 2016), a district court in the Ninth Circuit examined a Cellbrite search practically identical to that in the instant case and held that it was not a "forensic examination" under *Cotterman*:

> The Cellbrite device used software to extract data from the electronic devices, and printed out a report. The Cellbrite device provided no access to information encrypted, deleted or password protected. Applying the ruling in *Cotterman* to the facts in this case, the Court concludes that the search using the Cellbrite device did

---

[1] *See,* RE-89-4: Affidavit in Support of Search Warrant at pp. 1-2, PageID 344-45.

>not exhibit the "distinctive features of a computer forensic examination." The non-forensic scan of the electronic devices accessed information available to any manual user examining the electronic devices. In this case, the agents used the Cellbrite device to access information otherwise available to any manual user of Defendant's devices. The fact that the iPhone and iPad were password protected using the Defendant's date of birth did not transform the Cellbrite search into the type of computer forensic examination used in *Cotterman*.

(Citations omitted).

Finally, even if this Court does apply *Cotternman* and require reasonable suspicion for the search of Elkarra's phone, the agents in this case had it.

Reasonable suspicion to conduct an investigative stop "is based on the totality of the circumstances and has been defined as requiring articulable reasons and a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Lee*, 793 F.3d 680, 687 (6th Cir. 2015) (quoting *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999) and *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)) (internal quotation signifiers omitted). It is "dependent upon both the content of the information possessed by police and its degree of reliability." *Navarette v. California*, ___ U.S. ___, 134 S.Ct. 1683, 1687 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." *Navarette* at 1687 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)) (citations and internal quotation signifiers omitted). The information comprising reasonable suspicion need not come from the investigating officer's personal observation, but can be provided by other persons. *Navarette* at 1688.

In this case, CBP and HSI were acting on information provided by another federal law enforcement agency that Elkarra was the subject of a federal drug investigation; specifically, that he was a financier of an interstate marijuana trafficking organization. Their detention and search of Elkarra's phone was directly related in scope to the specifics of this information, and was thus justified by reasonable suspicion, even if such justification were required.

In sum, the search of Elkarra's phone upon his re-entry to the United States was a valid border search supported by any objective level of justification it required, and the defendant is not entitled to have evidence suppressed as a result.

## II.   THE DEFENDANT IS NOT ENTITLED TO RELIEF UNDER *FRANKS V. DELEWARE.*

The defendant next argues that the warrant should be stricken pursuant to *Franks v. Deleware*, 438 U.S. 154 (1978). However because the defendant simultaneously misapprehends the scope and purpose of *Franks* and fails to make the preliminary showing it requires, he is not entitled to relief on this ground.

In *Franks*, the Supreme Court held that:

> [W]here the defendant makes a substantial preliminary showing that a false statement  knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking from the face of the affidavit.

*Id.*   at 155-56. Thus, a defendant is entitled to a *Franks* hearing only if he: "1) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Young*, 847 F.3d 328, 348-49 (6th Cir. 2017). The mere allegation that the affiant intended to mislead the issuing magistrate is not enough to satisfy this requirement; the defendant must make a "strong preliminary showing" of *intent* to mislead or exclude critical information. *Id.* at 349. Moreover, "[i]t is not enough for defendants to show that the affidavit contains false information; in order to obain a *Franks* hearing, defendants must make a 'substantial preliminary

showing' that the false statements originated with the government affiant, not with the informants, or that the government affiant repeated the stories of the affiant with reckless indifference to the truth." *United States v. Giacalone*, 853 F.2d 470, 475-76 (6ᵗʰ Cir. 1988). Finally, "[t]he inquiry does not continue if the court finds that the exclusion of the allegedly false statement does not result in a lack of probable cause." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6ᵗʰ Cir. 1998).

The defendant focuses his *Franks*-related argument on approximately 13 paragraphs of the search warrant affidavit. Examining his claims one by one, it becomes clear that he has failed utterly to make the substantial preliminary showing required to even begin to be entitled to relief under *Franks*.

**Paragraph 17**

The defendant argues that this paragraph is simply "a general assertion from the Agent." In fact, the paragraph is exactly that, and does not purport to be anything else. It is simply a summary/introductory statement, which clearly draws its factual conclusions from elsewhere in the affidavit.

**Paragraph 18**

This paragraph makes the assertion that the drug trafficking organization discussed in the affidavit dates back to at least May 23, 2012, the day a package containing $23,000 in currency was seized from co-defendant Christopher Heffernan. It then goes on recount the facts surrounding that seizure.

The defendant argues that this is misleading in that, according to him, agents had no information that he had been in regular contact with Heffernan since 2012, and that he did not meet Heffernan until 2016.

12

The paragraph, however, makes no such claims. Instead, it merely sets forth the specific incident on which it bases the assertion that the organization dates back to 2012, and invites the court to draw its own conclusion as to whether the incident supports the inference. Moreover, the defendant's own, unsupported allegations as to what the agents knew about his contacts with Heffernan are precisely what the Sixth Circuit has held do not amount to the substantial preliminary show required by *Franks*, even if they did contradict the affidavit itself, which they do not.

**Paragraphs 19-26**

The defendant complains that the information in these paragraphs constitutes only information gleaned from the disputed border search. For the reasons set forth above, that search was valid; however, in addition, this is not the proper subject matter of a *Franks* motion.

He also argues that the information in these paragraphs was actually "extracted" on January 19, 2017, rather than on January 6 as purportedly claimed. "The phone was mirror copied on January 6, 2017," he argues. "The actual information and data was extracted on January 19, 2017."

This is nothing more than more than an extremely strained attempt at parsing the affiant's word choice. *Franks* provides a hearing upon a strong showing of intentional misrepresentation by the government's affiant. It is not an invitation to the type of merely literary criticism the defendant engages in here.

**Paragraph 27**

This paragraph discusses previous seizures of packages containing marijuana during the investigation and notes that the defendant and co-defendant Christopher Heffernan were "in frequent communication for unknown reasons." The defendant's sole complaint about this

13

paragraph is that this information was purportedly obtained as a result of the disputed border search. While, as discussed above, that search was valid in any event, it is plain from the text of the paragraph that in fact, this information came not from that search but from a separate analysis of phone toll records.

**Paragraph 28**

This paragraph notes that the defendant and co-defendant Jijad Hijazi were in communication on a weekly basis. The defendant asserts that it omits the fact that Hijazi is his cousin. Examining this claim in the context of the rest of the communication between the two discussed in the affidavit, this is hardly a material omission even if true; and the disputed information was not essential to the probable cause finding in any event.

**Paragraph 29**

This paragraph summarizes the investigation of other targets in the San Francisco area beginning in December 2016. The defendant contends that it contradicts the earlier paragraph concerning the currency seizure from Heffernan in 2012. To the contrary, paragraph 18 refers to the information about the 2012 seizure by San Francisco task force officers as "intelligence" supporting the inference that the conspiracy was ongoing as of that date. There is no claim that the investigation of these individuals as a conspiracy/drug trafficking organization began prior to 2016.

The defendant has thus failed in all respects to make the substantial preliminary showing that is a prerequisite to any relief under *Franks*, and his motion should be denied on that ground.

### III.   THE DEFENDANT'S MOTION TO SUPPRESS SHOULD BE DENIED PURSUANT TO THE GOOD FAITH EXCEPTION OF *UNITED STATES V. LEON* IN ANY EVENT.

Finally, even if the Court were to find some flaw in the warrant, DEA's reliance on it was justified by the good faith exception to the exclusionary rule of *United States v. Leon*, 468 U.S. 897 (1984). The same is true of any subsequent warrants obtained in this case based on applications which relied on information gleaned from the search of Elkarra's phone.

As the Sixth Circuit recently explained in *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017):

> In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). In a break from the previously reflexive and uncompromising approach of excluding all evidence seized without probable cause, the Supreme Court established a new objective inquiry limiting suppression to circumstances in which the benefits of police deterrence outweigh the heavy costs of excluding "inherently trustworthy tangible evidence" from the jury's consideration. *Id.* at 907. Following *Leon*, courts presented with a motion to suppress claiming a lack of probable cause must ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008) (quoting *Leon*, 468 U.S. at 923 n.23). Only when the answer is "yes" is suppression appropriate.

(multiple citations omitted).

In this case, even if the Court finds some flaw in the warrant, or in the underlying border search the fruits of which the magistrate judge relied upon in issuing it, it was not so egregious that a reasonably well trained officer would not have relied upon the warrant despite the magistrate

15

judge's decision. The same is true, by extension, of any subsequent search applications which relied upon information obtained pursuant to that warrant.

Accordingly, even if the Court were to find that the defendant's arguments about the validity of the search and warrant are correct, his motion to suppress should still be denied.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the defendant's motion to suppress be denied.

Respectfully submitted,

D. MICHAEL DUNAVANT
United States Attorney

By:     /s Christopher E. Cotten
        CHRISTOPHER E. COTTEN
        Assistant United States Attorney
        800 Federal Bldg., 167 N. Main
        Memphis, Tennessee 38103
        (901) 544-4231, chris.cotten@usdoj.gov
        No. 014277 (Tennessee)

## CERTIFICATE OF SERVICE

I, Christopher E. Cotten, Assistant United States Attorney for the Western District of Tennessee, do hereby certify that a copy of the foregoing motion has been sent, either first first-class postage pre-paid or via the Court's electronic filing system to attorneys for all defendants.

This 19th day of February 2018.

/s Christopher E. Cotten
CHRISTOPHER E. COTTEN
Assistant United States Attorney